DAYTON HYDRAULIC CO. v. FELSENTHALL.

(Circuit Court of Appeals, Sixth Circuit. June 3, 1902.)

No. 1,029.

1. RECEIVERS—EFFECT OF APPOINTMENT—TITLE TO LEASEHOLD.

A receiver appointed by a court of equity does not become the assignee of a leasehold merely because he is placed in possession of such a term; he is the mere custodian of the court, and no change of title occurs by reason of his appointment.

2. SAME—ADOPTION OF LEASE—TIME FOR ELECTION.

The mere fact that a receiver takes possession of leasehold premises does not amount to an adoption of the lease, or an assumption of its covenants, but it is the settled doctrine of the federal courts that he may take possession of and use the premises for a reasonable time to enable him to elect whether he will adopt the contract or surrender the property, being liable for rental, in case he surrenders it, only for the time he retains and uses it.

8. SAME—LIABILITY FOR RENTALS—REFUSAL TO SURRENDER CONSTRUCTIVE POSSESSION OF PROPERTY.

A corporation purchased 39 straw paper mills, 9 of which it at once closed. One of the mills so closed was on leasehold property, the lease giving the lessor the right of re-entry for default in payment of rent or taxes. The corporation paid the rentals until it became insolvent, and receivers were appointed for its property, including such mill; the order directing them to take possession, and enjoining all persons from interfering with the property thus placed in their custody. The receiver never took actual possession of the leasehold property, but, when the first installment of rent accrued after his appointment, he replied, to a demand therefor, by a request for time to look into the matter, and a year later a demand by the lessor for payment of rent or a surrender of the property was met by an offer, on behalf of the receiver and bondholders, to surrender possession on condition that all rent claims be released, and the lessor assume all back taxes. The lessor subsequently filed an intervening petition to require the receiver to pay the rental, which he answered by denying liability, but without offering to surrender the property. *Held*, that his rejection of the demand of the lessor for possession except on a condition which he had no right to impose was equivalent to an election to retain his constructive possession of the property, which bound the receivership for the payment of rental from that time forward.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

The question for decision involves the right of the Dayton Hydraulic Company, as lessor of a certain leasehold estate, to be paid the rentals which have accrued thereon since the appointment of a receiver for the lessee, the Columbia Straw Paper Company.

The material facts are as follows: The Columbia Straw Paper Company is a corporation organized in 1892 under the laws of New Jersey. It purchased, during that year, 39 independent mills operating in western states, and closed down 9 of them on acquiring title and possession. Among the mills so purchased and closed down was a mill at Dayton, Ohio. This Dayton mill was upon land leased by the Dayton Hydraulic Company for a term of 99 years, renewable forever, the lessee to pay all taxes. Appurtenant and incident to the land, and included in the same lease, was let the use of 450 cubic feet of water per minute, to be used on the said parcel of ground; same being supplied from a headrace owned and maintained by the lessor. For the land the lessee and its assigns covenanted to pay $75 per year in semiannual installments, and for the water power

116 F.—61

the sum of $400 per annum in like installments. A right to re-enter for default in rents was reserved.

This lease was originally made in 1854, but by several mesne conveyances came finally to the Columbia Straw Paper Company as assignee in 1892. These 39 mill properties, so acquired, were included in a general mortgage, made by the New Jersey company in 1892, to secure an issue of bonds. A default in interest having in due course occurred, a foreclosure bill was filed in January, 1895, by the mortgage trustees, in the circuit court of the United States for the Northern district of Ohio, and so-called ancillary bills were immediately filed in other jurisdictions. George P. Jones was appointed receiver under the original bill. One of these ancillary bills was filed in the circuit court for the Southern district of Ohio, and under that George P. Jones was also appointed receiver for the mortgagor company in Ohio.

The mortgage thus sought to be foreclosed included the property held under lease from the Dayton Company, it being therein conveyed and described as a leasehold. It was also described in the decree appointing Jones receiver in the Ohio suit, and the receiver was therein authorized and directed "to take immediate possession of all and singular the property above described, wherever situated or found," and all persons were "enjoined from interfering in any way whatever with the possession or management of any part of the business or property over which said receiver is so appointed as aforesaid," etc.

The Columbia Straw Paper Company acquired this Dayton mill in December, 1892, and immediately closed it down. All machinery was removed from and out of the mill, and when the receiver was appointed there was no movable property in said mill, or upon the leased ground, and the New Jersey company never thereafter had any actual possession of the premises. The company, however, paid the semiannual installments of rent until November, 1894, when it failed, and shortly thereafter went into the hands of a receiver. The receiver in the Ohio suit never took any actual possession of the dismantled Dayton mill, or made any actual use of the appurtenant water power.

It is also shown that in May, 1895, a receiver was appointed in New Jersey for the corporation, the appointment being under the act of that state of April 7, 1895. It does not, however, appear that the corporation ever had any property within that state, or that the receiver thus appointed ever became a party to any of the suits pending against the corporation in other jurisdictions where its property was situated.

The lessor semiannually sent bills to the Ohio receiver for the rents which accrued after the receivership. When the first of these bills was received, the receiver acknowledged its receipt, and replied under date of May 5, 1895, saying: "This, with other property of this company, is in process of foreclosure in the United States courts, and, as I am not informed fully as to the situation in Dayton, I would like a little enlightenment on the subject, as to just what interest the bondholders have in the Dayton property. Does this company own the land or is the whole interest a leasehold? Your interests cannot be jeopardized, I suppose, by a little delay."

Nothing more was heard from the receiver, nor did he make any offer to restore the property to the lessor or to surrender his constructive possession. No rent or taxes were ever paid by him, or offered to be paid. There is some evidence of negotiations between some of the agents of the lessee corporation and the counsel representing the bondholders, of which the lessor was advised, looking to a surrender of the lease, but nothing ever came of it. Under date of July 8, 1896, Messrs. McMahon & McMahon, counsel for the lessor, addressed a letter to the receiver in the following words:

"My Dear Sir: We represent the Dayton Hydraulic Co., lessors of the Dayton property to the Columbia Straw Paper Co. The property has been forfeited to the state for taxes, the amount now due being $352. The amount of water rent due the Hydraulic Co. is $1,234.37, to May 1, 1896. As receiver of the parent company, you have never taken possession of this property, and undoubtedly do not want it with the incumbrance of the overdue water rent. We would be pleased to have your attorney enter an

order declining the property, or, if you prefer, accepting the same, and providing for the payment of the rent. We would then make some arrangement to reclaim the property. As it is, no one is getting any benefit. Yours, truly,                                          McMahon & McMahon."

This was replied to by Dupee, Judah, Willard & Wolf, attorneys in Chicago, as follows:

"Gentlemen: Mr. George P. Jones, receiver of the Columbia Straw Paper Company, has handed us for reply your letter of the 8th inst. As we recollect, we wrote Mr. L. P. Conover, of this city, about the latter part of March, he then representing, as we understood, the Dayton Hydraulic Company, that we had no doubt the lease could be surrendered, so far as the bondholders and the two receivers are concerned, by orders entered in court here, where the mortgage receivership is, and in New Jersey, where the general receivership is, upon condition that all rent claims be released, and that the lessor assume all back taxes. Whether or not you would wish also to get a separate release from the company, we do not know. Yours, truly,                                    Dupee, Judah, Willard & Wolf."

The Mr. Conover referred to was an attorney for the Dayton Hydraulic Company, in whose hands the rent accounts had been placed. Dupee, Judah, Willard & Wolf were the attorneys for the mortgage trustees, and as such had filed the several foreclosure suits. They had not represented the receiver after October 1, 1895. No reply was made to this by McMahon & McMahon, and neither party applied to the court for any order in the matter. June 18, 1898, the Dayton Company filed its petition in the Ohio suit, praying that the rents and taxes accrued since the receivership be paid by the receiver. This the receiver answered, denying the liability for such rents. This answer did not propose to surrender the property, or express any past or present willingness to permit a re-entry by the lessor. In this situation the matter stood until July 8, 1898, when counsel for the Dayton Company addressed a letter to the Hon. W. H. Taft, the judge of the circuit court under whose order the receiver was acting, in these words:

"My Dear Sir: I am coming to Cincinnati some day next week to see you about the petition of the Dayton Hydraulic Co. against the Columbia Straw Paper Company, and write that you may, at your leisure, look over the petition and answer of the receiver. I am not coming down to call the matter up for hearing at this late day, and expect to have postponed the question of an order for rent and taxes past due. What I do not understand is how an officer of the United States court can hold property for four years, pay no rent or taxes, and, when called upon, still continue to hold the property, denying all responsibility for rent, taxes, etc. We expect to push the question, at the right time, for past-due rent. What I want to confer with you about is the further question whether the court will permit the receiver to continue to hold the property (unoccupied and unused), and require us to litigate in New Jersey about rents, etc. The action of the receiver strikes me as scandalous outrage. Very truly yours,      J. A. McMahon."

On July 11, 1898, the same counsel addressed a letter to Messrs. Kittredge & Wilby, attorneys for the receiver, which was as follows:

"Dear Sirs: I will be in Cincinnati to-morrow morning, wanting to see Judge Taft in the petition of Dayton Hydraulic Co. vs. Jones, Receiver of Columbia Straw Paper Co. I do not go with the expectation of calling up the case, but only to find out if the court will continue to hold this property now in default for taxes, rent, etc. Yours,            J. A. McMahon."

Mr. J. A. McMahon accordingly saw the receiver's counsel, and what occurred there is shown to have been included in a letter to Judge Taft, under date of July 12, 1898. That letter is as follows:

"Dayton, Ohio, July 12, 1898.

"Hon. Wm. H. Taft—My Dear Sir: I called to-day, but you were busy. Mr. Wilby and I met. He disclaimed any knowledge of the value of the leasehold to his clients, and requested further time to look into it, and to

correspond with them. As the receiver has the right to hold the property if the court so orders, I could not well object. Of course, I have not granted him further time to make an election, as I shall claim that he has long since sinned away his day of grace, and shall certainly claim rent and taxes for the time of occupation. And whatever time is extended is only on any claim to the court to have the property surrendered at once, as the rents are being contested. I write this letter to explain why I will not be down again. Mr. Wilby and I may agree upon an entry. I said to him that, not waiving right to past taxes and rents, my clients would accept surrender of property from the receiver, if he would have the order made. This he is considering. Hoping that you will have an enjoyable summer. Very truly yours,                                                J. A. McMahon."

To this Judge Taft replied as follows:

"My Dear McMahon: I have yours of the 12th inst., in reference to the Straw Board receivership case. I think that some action ought to be taken in the matter, and, if it is not made a matter of agreement, a motion to direct the receiver to turn over the property to you, leaving open the question of your right to have the previous taxes and rent paid by him out of the funds in his possession, would be considered. You can, if you agree upon the entry, send it to me to my address in Canada, which is 'Point au Pic, Province of Quebec, Canada.' Very sincerely yours,·    Wm. H. Taft."

The agreed facts, then, state that "numerous interviews took place between counsel during 1899 and 1900, looking to some compromise, but with no result." At no time was any surrender of the premises proposed, or any proposition made in respect to a surrender, except the one stated in the letter of Dupee, Judah, Willard & Wolf, of July 16, 1896. These premises are not included in the order of sale made ultimately in the Ohio suit, and the leasehold remained unsold and unsurrendered until the decree appealed from. In July, 1901, the court below denied all relief, and dismissed the intervening petition, but ordered the premises restored to the possession of the lessor company. From this decree the Dayton Company has appealed.

John W. Warrington and John A. McMahon, for appellant.
Joseph Wilby, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court as follows:

The learned trial judge denied all relief to the lessor because he was of opinion that the receiver had neither adopted the lease, and thereby assumed the burden of the lessee's covenants, nor made the receivership responsible for the reasonable value of the rentals accruing after the receivership, because he had never, in fact, taken actual possession of the premises.

A receiver appointed by a court of equity does not become the assignee of a leasehold merely because he is placed in possession of such a term. Such a receiver is the mere custodian of the court, and no change of title occurs by reason of his appointment. His possession is not by act of the parties nor under any assignment, for he holds under and for the court appointing him. The property in his custody is in custodia legis.

In the absence of some statute casting the title upon the receiver, or some assignment made by the lessee, it is difficult to see how a judicial receiver can in any accurate sense be said to be the assignee of the term. There is no privity of estate between such a receiver and the

lessor, as the appointment neither changed the title nor created any lien on the property. These principles are well settled. Carswell v. Trust Co., 20 C. C. A. 282–285, 74 Fed. 88; Farmers' Loan & Trust Co. v. Northern Pac. R. Co. (C. C.) 58 Fed. 257; Bell v. Protective League, 163 Mass. 558, 40 N. E. 857, 28 L. R. A. 452, 47 Am. St. Rep. 481; Oil Co. v. Wilson, 142 U. S. 313-322, 12 Sup. Ct. 235, 35 L. Ed. 1025; Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632; Gaither v. Stockbridge, 67 Md. 222, 9 Atl. 632, 10 Atl. 309; High, Rec. p. 273; Stokes v. Hoffman House, 167 N. Y. 554, 60 N. E. 667, 53 L. R. A. 870; Tradesman Pub. Co. v. Knoxville Car-Wheel Co., 95 Tenn. 634, 32 S. W. 1097, 31 L. R. A. 593, 49 Am. St. Rep. 943.

Cases have been cited from the New York court of appeals in which it is asserted that there is no difference between an assignee and a receiver who takes possession of leased premises. But the cases cited are based upon a construction of a statute of that state which the court construed as vesting title in receivers of insolvent companies. Attorney General v. Atlantic Mut. Life Ins. Co., 100 N. Y. 280, 3 N. E. 193; Woodruff v. Railroad Co., 93 N. Y. 609. That a chancery receiver is not an assignee of a term is thoroughly settled in New York. Stokes v. Hoffman House, 174 N. Y. 554, 60 N. E. 667, where the New York cases are reviewed.

The mere fact that a judicial receiver has taken possession of a leased line of railroad or a leased railroad equipment, and has used same for the benefit of his trust, has not, without other circumstances, been regarded as amounting to an adoption of the lease, or an assumption of the covenants of the term.

The doctrine that a receiver may take possession of a leasehold, and use the premises for a reasonable time to enable him to elect whether he would adopt the contract and make it his own, or surrender the property to the lessor, so far as he is able to do so without affecting the term as between lessor and lessee, has become the settled rule in courts of the United States. Oil Co. v. Wilson, 142 U. S. 313–322, 12 Sup. Ct. 235, 35 L. Ed. 1025; Railroad Co. v. Humphreys, 145 U. S. 82–101, 12 Sup. Ct. 787, 36 L. Ed. 632; Carswell v. Trust Co., 20 C. C. A. 282–285, 74 Fed. 88; Platt v. Railroad Co., 28 C. C. A. 488, 84 Fed. 535.

In Oil Co. v. Wilson, cited above, the court said:

"The receiver did not simply, by virtue of his appointment, become liable upon the covenants and agreements of the railway company. High, Rec. p. 273; Hoyt v. Stoddard, 2 Allen, 442. Upon taking possession of the property, he was entitled to a reasonable time to elect whether he would adopt this contract, and make it his own, or whether he would insist upon the inability of the company to pay, and return the property in good order and condition, paying, of course, the stipulated rental for it so long as he used it. Turner v. Richardson, 7 East, 335; Com. v. Franklin Ins. Co., 115 Mass. 278; Sparhawk v. Yerkes, 12 Sup. Ct. 104, 35 L. Ed. 915."

In Carswell v. Trust Co., cited above, this court said:

"Whatever the doubt at one time entertained as to the effect of a receiver taking possession of leasehold property under an order of a court of equity, it is now well settled that such a receiver may take and retain possession

of leasehold interests for such reasonable time as will enable him to intelligently elect whether the interest of his trust will be best subserved by adopting the lease, and making it his own, or by returning the property to the lessor."

The liability of the receivership for rentals during the time a receiver has actually used the leased premises has in general not been disputed. In such cases, the controversy has turned mainly upon whether rent should be paid according to the stipulations of the contract between lessor and lessee, or upon the basis of a reasonable compensation to the lessor. But it is said that this case is to be distinguished from all of the cases cited because the receiver neither adopted the lease, nor agreed to pay rents for the premises, and never took any actual possession. It must be conceded that the record is barren of any facts which would authorize us to hold that the receiver has either intentionally or impliedly adopted the lease, or that he has ever expressly agreed to pay rent for the premises, or that he ever had any actual physical possession of the leasehold estate. Notwithstanding these concessions, it is entirely agreeable to the equitable principles regulating the relation of such officers to leasehold estates, that, by acts and conduct not involving an actual occupation of the premises, a receiver may come under an equitable obligation to a lessor for rents accruing during the receivership. A court of equity will not suffer an injustice to be done a lessor by acts or conduct which amount equitably to an exclusion of the lessor from the premises, and an appropriation of them to the supposed benefit of the trust. The legal relation of a statutory liquidator under the English company's act of 1862 seems to be identical with that of a chancery receiver, inasmuch as no change of title occurs upon such an appointment. The question as to when such a liquidator has made himself liable for rents accruing after his appointment, on account of leasehold interests belonging to the insolvent company, so as to make it equitable that the landlord should be allowed to distrain or have his debt paid in full, has frequently arisen in winding up cases arising under the company's act. The result of the decisions in respect to the liability of the assets in such a liquidator's custody for rents accruing after the commencement of winding-up proceedings is well summarized by Lindley, L. J., in Re Oak Pits Colliery Co., 21 Ch. Div. 322, 330, where it is said:

"If the liquidator had retained possession for the purposes of the winding-up, or if he has used the property for carrying on the company's business, or has kept the property in order to sell it, or to do the best he can with it, the landlord will be allowed to distrain for rent which has become due since the winding-up. In re Lundy Granite Co., L. R. 6 Ch. 462; In re North Yorkshire Iron Co., 7 Ch. Div. 661; In re Silkstone & Dodworth Coal & Iron Co., 17 Ch. Div. 158; In re South Kensington Co-operative Stores, 17 Ch. Div. 161; and see In re Brown, Bayley & Dixon, 18 Ch. Div. 649, per Fry, J.

"2. But if he has kept possession by arrangement with the landlord, and for his benefit as well as for the benefit of the company, and there is no agreement with the liquidator that he shall pay rent, the landlord is not allowed to distrain. In re Progress Assurance Co., L. R. 9 Eq. 370; In re Bridgewater Engineering Co., 12 Ch. Div. 181. When the liquidator retains the property for the purpose of advantageously disposing of it, or when he continues to use it, the rent of it ought to be regarded as a debt contracted for the purpose of winding up the company, and ought to be paid in full like

any other debt or expense properly incurred by the liquidator for the same purpose; and in such a case it appears to us that the rent for the whole period during which the property is so retained or used ought to be paid in full, without reference to the amount which could be realized by a distress. This was the view taken by Lord Justice James in the Case of Lundy Granite Company, and by Mr. Justice Fry in Re Brown, Bayley & Dixon, and by Mr. Justice Kay in the present case. But no authority has yet gone the length of deciding that a landlord is entitled to distrain for, or be paid in full, rent accruing since the commencement of the winding-up, where the liquidator has done nothing except abstain from trying to get rid of the property which the company holds as lessee. If the landlord had endeavored to re-enter, and the liquidator had objected, the case might be different, but, having regard to the provisions of the company's act of 1862, we are of opinion that, in the case now supposed, the landlord must rely upon his right, if any, to re-enter and prove for the arrears due to him, and that he is not entitled to anything more."

That the receiver was not in the actual possession of the leased premises is not necessarily conclusive against liability. He was constructively in possession, for the decree appointing him described this leasehold by reference, and directed him to take possession. More than that, all persons were enjoined from interfering with the property thus placed in his care and custody. If the lessor had without leave of the court, or consent of the receiver, intruded upon the premises, by re-entering, it would have been a plain contempt of court.

It is very plain, from the facts heretofore stated, that the value of this Dayton mill and water power to the Columbia Straw Paper Company was not in its operation as a going concern, for it was closed down and dismantled so soon as it was acquired, and was kept closed, together with 8 other mills, although the rents were paid until just before a receiver was appointed. That this was done for the benefit of the 30 mills which were operated, we may fairly and justly infer. It is a case where the facts speak for themselves. Under such conditions, a receiver might well continue the policy of the mortgagor company by simply holding onto the leasehold. If he could do this without paying rents, so much the better. If he incurred liability by endeavoring to keep it, the return was in the benefit to the other mills. So long as the mill site and water power was in his constructive possession, it could not be operated in competition, and to the disadvantage of the other mills in his charge. Actual occupancy was, therefore, not necessary to continue to the receivership the same value which the Dayton mill had had to the Columbia Straw Paper Company.

That the receiver desired to keep these premises with a view of thus using it in the continuation of the Straw Paper Company business, and of doing the best he could do with it as a part of the great combination of mills upon which the mortgage under foreclosure rested, would seem to be inferable from his general conduct toward the lessor as shown by the facts we have heretofore stated. To briefly restate the substance of these facts: First. When the first installment of rent accrued after his appointment, he responded to a demand for the rent by a request for time to look into the matter. This was early in 1895. Second. We pass over the negotiations which followed, between the mortgagees and an agent of the Dayton Company, looking to a sur-

render of the lease, and which came to no result, as possibly not closely affecting the question of the receiver's liability, though indicative of the unwillingness of the foreclosing mortgagees to surrender. Third. We find that when the lessor applied to him in July, 1896, to either have an order entered declining to adopt the lease, or provide for the rent, he did neither, but turned the application over to the attorneys representing the foreclosure proceedings, who replied by expressing the opinion "that the lease could be surrendered, so far as the bondholders and the two receivers are concerned, by orders entered upon condition that all rent claims be released, and that the lessor assume all back taxes." Fourth. To the petition of the lessor filed in July, 1898, the receiver defended by denying liability, but did not propose to surrender the property, or ask any instruction from the court in respect to the matter. Fifth. Still later, the receiver's attorney, when urged to some conclusion, "disclaimed any knowledge of the value of the leasehold to his clients, and requested time to look into it, and to correspond with them."

The proposition to accept a surrender of the property from the receiver, not waiving the claim "to past taxes and rents," was taken under consideration, without any result. The application rocked along from July, 1896, to July, 1901, without a proposal to surrender the lease, when the court finally denied all rents, but ordered the receiver to surrender the premises to the lessor.

Under the circumstances of this case, we conclude that the receiver, to use the words of Lindley, L. J., in Re Oak Pits Colliery Co., 21 Ch. Div. 322, 331, has done much more than to merely "abstain from trying to get rid of the property which the company held as lessee." His whole conduct was that of one who was neither willing to give up the premises, nor to make the lease his own. Neither can the Dayton Company wholly escape criticism for its inaction and uncertain attitude. It had reserved a right to re-enter for default in rents, and this right it might have exercised by notice and proper application to the court below. True, it was under no legal obligation to avail itself of this right, though its failure to do so deprives it of some of the equitable consideration which might otherwise add to the weight of its present claim. That it did not do so is most probably accounted for by its reluctance to forfeit the lease so long as there was any hope that the receiver would adopt it. The delay requested by the receiver in response to the first rent account sent him was calculated to lull the lessor into a belief that the receiver might make the lease his own. Such an opinion was also strengthened by the nonaction of the mortgagor company and of the mortgagees, although both had under consideration a surrender of the lease. But in July, 1896, the patience of the lessor seems to have reached a limit; for the letter of its attorneys, under date of July 8, 1896, can be but regarded as calling upon the receiver to either have an order entered declining the lease for his trust, or to provide for rents. This endeavor to re-enter was prevented by the conduct of the receiver in referring the matter to the attorneys representing the foreclosure proceedings for answer. This answer must be regarded as the answer of both the receiver and the

mortgagees, who were alone interested, for, having submitted this communication to the attorneys of the mortgagees for answer, the receiver must be regarded as bound by the answer.   In effect, the reasonable demand for a surrender of the leased premises was rejected, for it involved as a condition that all demands for past rents and taxes should be released.   The proposition to surrender the property, reserving all question of liability for past rents and taxes, was renewed after the petition of the appellant was filed.   This, though most reasonable and beneficial to the receivership, unless the purpose of the receiver was to maintain control of the term and of the premises for the general benefit of his trust, was taken under consideration, and, so far as this record discloses, was never answered; for no effort was ever made by the receiver to obtain an order surrendering the premises, and no such order was in fact made until made as a part of the decree herein under review.

These considerations lead us to the conclusion that the receiver has appropriated the premises to the use of the other properties committed to his charge, in the way in which it was most useful, by retaining his hold upon the term, and his constructive possession of the premises; and that from July 16, 1896, he ought to compensate the lessor by paying the rents stipulated in the lease and the taxes, both limited to rents and taxes accruing thereafter, and up to the date of the decree restoring possession to the lessor, but without interest. We fix the date of July 16, 1896, as the date when the receiver must be regarded as coming under an obligation to pay the accruing rentals, because we must regard the answer to the request for a surrender as a definite objection to a re-entry by the lessor except upon conditions which the receiver had no right to impose.   The mortgagees who must suffer by this decree have no possible ground for complaint, for they seem to have guided the conduct of the receiver which has involved the receivership in this burden.

The decree will be reversed, and a decree entered in accordance with this opinion.